AMANDA L. WEITER,                )
                                 )
          Plaintiff,             )
                                 )     No. 4:09CV00702 FRB
                                 )
     v.                          )
                                 )
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
          Defendant.             )

**MEMORANDUM AND ORDER**

          This matter is on appeal for review of an adverse ruling

by the Social Security Administration.  All matters are pending

before the undersigned United States Magistrate Judge, with consent

of the parties, pursuant to 28 U.S.C. § 636(c).

**I.   Procedural Background**

          On September 20, 2006, plaintiff protectively filed her

applications for Disability Insurance Benefits ("DIB") pursuant to

Title II of the Social Security Act ("Act"), and for Supplemental

Security Income ("SSI"), pursuant to Title XVI of the Act.

(Administrative Transcript ("Tr.") 90-97).  Therein, plaintiff

alleged disability due to fibromyalgia,[1] attention deficit

---

[1]"Fibromyalgia, a chronic condition recognized by the American College
of Rheumatology (ACR), is inflammation of the fibrous and connective tissue,
causing long-term but variable levels of muscle and joint pain, stiffness, and
fatigue." Brosnahan v. Barnhart, 336 F.3d 671, 672 n. 1 (8th Cir. 2003).
"Diagnosis is usually made after eliminating other conditions," and is

disorder, dysthymia,[2] and asthma. (Tr. 116). Her claims were initially denied, and she filed a request for a hearing before an administrative law judge ("ALJ"). (Tr. 57-58; 67).

On August 22, 2008, a hearing was held before an ALJ in Creve Coeur, Missouri. (Tr. 17-50). On September 23, 2008, the ALJ issued a decision finding that plaintiff was not under a "disability" as such is defined in the Act, and determined that plaintiff could return to her past work as a cashier and as a server at parties. (Tr. 7-16).

Plaintiff filed a request for review of the hearing decision with defendant Agency's Appeals Council, (Tr. 51), and on March 31, 2009, the Appeals Council declined to review the ALJ's decision. (Tr. 1). The ALJ's decision thus stands as the Commissioner's final decision. 42 U.S.C. § 405(g).


## II. Evidence Before The ALJ

### A. Medical Records

The record indicates that plaintiff saw William L. Johnson, M.D., on May 12, 1999, for evaluation of allergies. (Tr. 209-14). Plaintiff complained of allergy symptoms that had been increasing with each passing year, and reported having taken

---

diagnosed based upon subjective symptoms. Id.

[2]Dysthymia is a mood disorder characterized by mild depression or irritable mood, and is often combined with other symptoms, such as eating and sleeping disorders, and fatigue.
http://www.merriam-webster.com/medlineplus/dysthymia

Intal,[3] Albuterol,[4] Allegra,[5] Claritin,[6] and Flonase.[7] (Tr. 209).

Examination revealed slight wheezes and mildly obstructed pulmonary function. (Tr. 210). Allergy skin testing was positive for most of the pollens, as well as dust mites and dander. (Tr. 210, 208). Plaintiff was diagnosed with mild persistent asthma and allergic rhinitis, and advised to stop smoking. (Tr. 210). Plaintiff saw Dr. Johnson on several occasions for continued evaluation and treatment of asthma and allergic rhinitis from February 21, 2001 through June 2, 2006. (Tr. 192-207). On May 31, 2005, plaintiff saw Dr. Johnson, who noted that plaintiff's last visit had been on September 10, 2003. (Tr. 196). Dr. Johnson noted that plaintiff was "not very compliant" with her medication. (Id.) On February 21, 2001, Dr. Johnson quoted plaintiff as saying that she "didn't pay much attention to the asthma," and noted that she had run out

---

[3]Intal, or Cromolyn, is used to prevent the wheezing, shortness of breath, and troubled breathing caused by asthma. It also is used to prevent breathing difficulties (bronchospasm) during exercise.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601042.html

[4]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[5]Allegra, or Fexofenadine, is used to relieve the symptoms of seasonal allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697035.html

[6]Claritin, or Loratadine, is used to temporarily relieve allergy symptoms. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html

[7]Flonase, or Fluticasone, is a nasal spray used to relieve the symptoms of seasonal and perennial allergies.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695002.html

of Pulmocort one month ago, but was never very compliant with her medication. (Tr. 205).

The record indicates that plaintiff saw Jay Liss, M.D., a psychiatrist, on April 6, 2005.[8] (Tr. 269). Plaintiff reported working at Bed, Bath, and Beyond, and at Bar Italia. (Id.) She reported having moved in with her boyfriend. (Id.) It appears plaintiff was prescribed Adderall,[9] Effexor,[10] and Trazodone.[11] (Id).

The record indicates that plaintiff visited HealthSouth for physical therapy on 3 occasions from April 21, 2005 through June 9, 2005. (Tr. 183-189). On April 21, 2005, plaintiff complained of pain along the left side of her neck and occasionally down her left arm, and underwent physical therapy. (Tr. 187). On May 19, 2005, plaintiff returned and reported feeling about 50 to 75 percent better overall with less neck and arm pain, and stated that she was working with less discomfort also. (Tr. 185).

---

[8]All of Dr. Liss's treatment notes are handwritten, and consist of little more than brief, sometimes illegible phrases regarding plaintiff's reported symptoms. See (Tr. 269-74; 350; 387-96). Furthermore, while the administrative transcript includes Dr. Liss's records dated from 2005 through 2008, the record indicates, and the Commissioner does not dispute, that Dr. Liss had treated plaintiff since 1996. See (Tr. 397).

[9]Adderall, a combination of dextroamphetamine and amphetamine, is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder ("ADHD").
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html

[10]Effexor, or Venlafaxine, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

[11]Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

Plaintiff stated, "[t]herapy really seems to be helping." (Id.)

Plaintiff returned to Dr. Liss on May 18, 2005 and reported having visited St. Anthony's Emergency Room. (Tr. 270). There is also an apparent notation that plaintiff "was drunk and took pill," and that her boyfriend took her to the hospital. (Tr. 270).

When plaintiff presented for physical therapy on June 9, 2005, plaintiff reported that she felt 80 to 90 percent better overall "with minimal to no pain into [left] neck and arm any more." (Tr. 183). Plaintiff stated "I am able to do more at work and with less pain. I do not get the spasms and tightness like initially." (Id.) The physical therapist noted good overall improvement in flexibility, range of motion, and improving strength of plaintiff's upper extremities and scapular region. (Id.) It was noted that it was plaintiff's last authorized visit, and that she would continue with the "home program." (Id.)

On August 2, 2005, plaintiff saw Nurse Practitioner Marva J. Williams with complaints of neck and left shoulder pain. (Tr. 180). Nurse Williams noted that plaintiff had been "in and out of Physical Therapy for the last six months." (Id.) Nurse Williams noted that strengthening exercises and physical therapy "had really relieved and controlled her discomfort." (Id.) Nurse Williams also noted that plaintiff was discharged from Physical Therapy at the end of June, and "decided to take a break" in July. (Id.) The record indicates that, towards the end of July,

plaintiff was playing a game of washers, and called on August 1, 2005 with complaints of severe neck and left shoulder pain. (Tr. 180). Upon examination, plaintiff was in no acute distress, and had full range of motion of her head and neck and shoulders, with some shoulder tenderness. (Id.) Nurse Williams noted that plaintiff understood that strengthening exercises were important for her to remain pain free, and advised plaintiff to "get back on her exercise program." (Id.)

Plaintiff returned to Dr. Liss on August 5, 2005. (Tr. 271). It is noted that plaintiff was asked about medication interaction, and that plaintiff worked at Bed, Bath and Beyond. (Id.) There is a notation that appears to say that plaintiff needed to be more assertive, and that she was filling out financial forms for school. (Id.) Dr. Liss prescribed Adderall and Effexor. (Id.) Plaintiff saw Dr. Liss again on November 14, 2005 and stated that she was fixing up her house, and that she and her boyfriend had been together for five years. (Tr. 272). Her medications were continued. (Id.)

Plaintiff saw Nurse Williams on December 7, 2005, with complaints of nasal congestion and pressure. (Tr. 181). Upon examination, Nurse Williams noted that plaintiff was in no acute distress, but had slight swelling of her nasal membranes. (Id.) Plaintiff was prescribed an antibiotic, a nasal decongestant/expectorant, and saline nasal spray, and advised to take Ibuprofen as needed. (Id.)

-6-

On January 19, 2006, plaintiff visited the emergency room at St. Anthony's Medical Center with complaints of neck spasm. (Tr. 176). Plaintiff rated her pain as "moderate;" stated she had had this problem for three years; and that this episode had been "constant." (Tr. 176-77). It is noted that, according to plaintiff and her family, plaintiff's pain had been a problem "for some time." (Tr. 177). Plaintiff was examined by C. Bosche, M.D., who noted that plaintiff was completely neurologically intact. (Id.) X-ray of plaintiff's cervical spine was negative. (Tr. 178).

On January 20, 2006, plaintiff saw Robert J. Backer, M.D., with complaints of neck spasms and pain that was "better today." (Tr. 228). Plaintiff indicated that she had had this problem for five years; that she was at work at the onset of her problem; and that standing too long and lifting were factors of her problem. (Tr. 229). Plaintiff reported taking Effexor, Minocycline,[12] Trazodone, Ibuprofen, Oxycodone,[13] and Flexeril.[14] (Id.) Range of motion was slow but full, and an MRI, performed at St. John's Mercy Medical Center, revealed mild diffuse disk bulging

---

[12]Minocycline is used to treat bacterial infections and acne. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682101.html

[13]Oxycodone is an opiate analgesic used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html

[14]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

at C4-5, and mild left maxillary sinus disease. (Tr. 232).
Plaintiff was diagnosed with myofascial pain. (Tr. 231).

On February 1, 2006, plaintiff saw Stephen Schmidt, M.D.,
of Western Anesthesiology Associates, Incorporated, Pain Management
Services. (Tr. 233-37).[15] Plaintiff denied arm pain, but
complained of moderate neck pain that had begun years ago due to
muscle spasms, and described her pain as shooting, throbbing,
aching and burning. (Tr. 233). Plaintiff reported having tried
physical therapy, chiropractic care, and cold and heat therapy, and
stated that her symptoms improved significantly after taking a
Medrol Dosepak,[16] which she had not done before. (Id.) Plaintiff
stated that, prior to this, she had to leave work many times
because of severe pain and great difficulty rotating her neck.
(Id.) Plaintiff reported weight and appetite changes, disturbed
sleeping habits, sinusitis, headaches, depression, mood swings, and
anxiety. (Tr. 234). Upon examination, plaintiff had full neck
range of motion, and had a forward-flexed gait and stance. (Tr.
235). Plaintiff had increased pain with extension of the spine,
and improvement of the pain with flexion of the spine. (Id.) She

_____

[15]Dr. Schmidt's records appear at more than one place in the
Administrative Transcript. The undersigned will refer only to the first
occurrence.

[16]Medrol, or Methylprednisolone, is a corticosteroid is used to relieve
inflammation, and is used to treat certain forms of arthritis; skin, blood,
kidney, eye, thyroid, and intestinal disorders (e.g., colitis); severe
allergies; and asthma.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html

was tender over the lumbar facet joints, and had diffuse tenderness throughout the trapezius muscle into the cervical paraspinous musculature. (Id.) She had full range of motion of her upper and lower extremities; she was alert and oriented; and she had a normal affect and appropriate judgment and memory ability. (Tr. 236).

Dr. Schmidt's assessment was myofascial pain syndrome, noting that plaintiff had non-radiating neck pain and a negative neurological examination. (Id.) Dr. Schmidt wrote that he was unsure what was causing plaintiff's pain, and wrote that it could be primarily muscular; it could be facet joint abnormality; or it could be related to plaintiff's disc. (Id.) Dr. Schmidt recommended conservative treatment and prescribed an oral anti-inflammatory, Voltaren,[17] and physical therapy, and stated that trigger point injections may be considered in the future. (Tr. 236-37).

Plaintiff returned to Dr. Schmidt on March 9, 2006 with complaints of neck and bilateral elbow pain that had worsened. (Tr. 238). Plaintiff stated that the medications she had been given at the last office visit provided no relief. (Id.) Dr. Schmidt assessed neuralgia/neuritis, and wrote that he had no explanation for plaintiff's pain. (Tr. 239). Dr. Schmidt wrote

_____

[17]Voltaren, or Diclofenac, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), and ankylosing spondylitis (arthritis that mainly affects the spine).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html

that he did not think injections would help plaintiff, and prescribed Neurontin,[18] Elavil,[19] and a Medrol Dosepak, and advised her to follow up in one month. (Id.) Dr. Schmidt wrote that, if plaintiff failed to improve, she should be seen by a rheumatologist. (Id.)

Plaintiff returned to Dr. Schmidt on April 3, 2006 and reported that her symptoms were better, but that she still had variable back, neck, shoulder and elbow pain. (Tr. 240). Dr. Schmidt recommended that plaintiff see a rheumatologist. (Tr. 241).

On May 3, 2006, plaintiff saw Stephen C. Ross, M.D., of Arthritis Consultants, Inc., with complaints of intermittent pain in her cervical spine over the last two to three years, which had progressed to involve widespread musculoskeletal pain. (Tr. 222). Dr. Ross noted that plaintiff had improved somewhat with the use of Elavil and Neurontin, but had not been working over the last several months due to the pain. (Id.) Plaintiff reported taking Neurontin, Zyrtec,[20] Minocycline (for acne), Voltaren, Effexor, Adderall, and Elavil. (Id.) Upon examination, Dr. Ross noted that

---

[18]Neurontin, or Gabapentin, is used to help control certain types of seizures in patients who have epilepsy. It is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

[19]Elavil, or Amitriptyline, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

[20]Zyrtec, or Cetirizine, is used to treat the symptoms of seasonal allergies.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698026.html

plaintiff was in no acute distress, rose from the examination table without difficulty, and ambulated normally. (Id.) Examination was unremarkable. (Tr. 222). Plaintiff had full range of motion of the cervical, thoracic, and lumbar spine, and her fist closure and grip strength was 100 percent. (Id.) She had multiple tender points present over her trapezius muscles, occiput (the back of the head), scapula, gluteals, costochondra (the joining of a rib and cartilage), epicondyles (prominences on the ends of long bones serving for the attachment of joints and ligaments), and greater trochanters (rough prominences of the upper part of the femur serving for the attachment of muscles). (Id.) Dr. Ross's impression was "[p]robable fibromyalgia syndrome with widespread musculoskeletal pain, sleep disturbance, and tender points." (Id.) He advised plaintiff to continue her current medications and her exercise program, and should also ask her dermatologist (Dr. Bauschard) about stopping Minocycline, because Minocycline was sometimes associated with musculoskeletal symptomatology. (Tr. 222-23).

On May 4, 2006, plaintiff returned to Dr. Schmidt with the chief complaint of pain. (Tr. 244). She reported that the medications she had been given had caused headache and weight gain. (Id.) Dr. Schmidt noted that plaintiff had seen a rheumatologist, who ordered tests but that the results had not yet been returned. (Id.) Examination was normal, and Dr. Schmidt's assessment was neuralgia/neuritis. (Tr. 245). Dr. Schmidt recommended that

plaintiff wean off Neurontin to control the side effects.  (Id.)

On May 18, 2006, plaintiff saw Elizabeth A. Tracy, M.D. for a well-woman's examination.  (Tr. 182).  Plaintiff reported that she was taking Zyrtec, Albuterol, Nasonex,[21] Patanol,[22] Effexor, Elavil, Clindamycin,[23] and Adderall, and Elidel[24] and Triamcinolone[25] cream for Eczema.  (Id).  Plaintiff advised that she had recently been diagnosed with fibromyalgia, and that she was undergoing physical therapy, but that her asthma was not bothersome.  (Id.) Upon examination, Dr. Tracy noted that plaintiff was pleasant, mildly anxious, and in no acute distress.  (Id.)

Plaintiff returned to Dr. Ross on May 26, 2006, and it was noted that she was no longer taking Minocycline and was weaning off of Neurontin.  (Tr. 225).  It was noted that plaintiff was

_____

[21]Nasonex, or Mometasone nasal inhalation, is a topical steroid that is used for the treatment and prevention of nasal symptoms of seasonal and year-round allergies, including runny nose, sneezing, and itchy nose. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602024.html

[22]Patanol, or Olopatadine, is an antihistamine used to treat the symptoms of allergic pink eye. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602025.html

[23]Clindamycin is an antibiotic used to treat certain types of bacterial infections, including infections of the lungs, skin, blood, female reproductive organs, and internal organs. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682399.html

[24]Elidel, or Pimecrolimus, is used to control the symptoms of eczema (atopic dermatitis; a skin disease that causes the skin to be dry and itchy and to sometimes develop red, scaly rashes). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603027.html

[25]Triamcinolone is used to treat the itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various skin conditions. It is also used to relieve the discomfort of mouth sores. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601124.html

doing physical therapy and stretching. (Id.) Plaintiff saw Dr. Ross again on July 20, 2006 with complaints of knee pain; stated she could not do any tasks, and that her muscles gave out. (Tr. 224). She had positive tender points, and 4 out of 5 strength secondary to pain. (Id.)

Plaintiff returned to Dr. Schmidt on June 1, 2006, and reported worsening pain, stating that she had weaned off Neurontin, but that her pain had increased. (Tr. 246). Examination was normal. (Id.) Dr. Schmidt assessed fibromyalgia. (Tr. 247).

Dr. Schmidt's records contain a June 9, 2006 notation that, on June 8, 2006, plaintiff asked to speak to Dr. Schmidt regarding her leave of absence and her limitations. (Tr. 364). Dr. Schmidt's response was that he did not do disability ratings and limitations, and to make an appointment if she needed a specific statement regarding work. (Id.)

Also on June 9, 2006, plaintiff saw Dr. Liss, who noted that she had been diagnosed with fibromyalgia, and that she felt frustrated. (Tr. 273). Plaintiff reported persistent pain, and stated that she had to reconsider her future. (Id.) Plaintiff's Effexor dosage was increased, and she was continued on Adderall, Topamax[26] and Elavil, and Clindamycin was given instead of

---

[26]Topamax, or Topiramate, is used alone or with other medications to treat certain types of seizures in people who have epilepsy. Topiramate is also used to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html

Minocycline. (Id.)

Dr. Schmidt's office records include a June 12, 2006 notation from Gregory H. Smith, D.O., of Dr. Schmidt's office. (Tr. 365). Plaintiff had called the office exchange over the weekend to request Elavil because she had run out, and was unable to sleep. (Id.) A prescription for Elavil was called in to plaintiff's pharmacy. (Id).

On June 14, 2006, plaintiff saw Dr. Schmidt for discussion regarding her fibromyalgia. (Tr. 366). She complained of pain that had remained unchanged, and it was noted that medications had provided 30% relief that was partial and temporary. (Id.) Plaintiff had increased her dosage of Effexor. (Id). Examination was normal, and Dr. Schmidt noted that plaintiff had a normal affect, and was alert and oriented with appropriate judgment and memory. (Tr. 367). Dr. Schmidt noted that plaintiff had questions related to her ability to work, and stated that she needed restrictions in order to continue working. (Tr. 366). Dr. Schmidt's impression was myofascial pain syndrome, and he gave plaintiff "appropriate work restrictions" and advised her to follow-up as needed. (Tr. 367).

On August 10, 2006, plaintiff saw Dr. Schmidt with complaints of pain in her leg, ankle, wrist, elbow, and head. (Tr. 250). She stated that medication had provided no relief. (Id.) Examination was normal. (Tr. 250-51). Dr. Schmidt assessed fibromyalgia; advised plaintiff to continue to wean off Topamax

because it was not helping; to take Elavil and a Medrol Dosepak; and to do aquatic therapy. (Tr. 251).

On August 14, 2006, Dr. Schmidt wrote that he had been treating plaintiff for a medical condition since February of 2006, and that her condition had existed for some time before that date. (Tr. 370). Dr. Schmidt wrote:

> The patient has been undergoing medical treatments on multiple fronts to try to alleviate her pain. [Plaintiff's] painful condition has definitely been a difficult situation and she has had a difficult time concentrating and completing her work both at school and on her job front. The patient is currently receiving treatment and will for the foreseeable future.

(Id.)

Dr. Schmidt's records indicate that, on August 21, 2006, plaintiff called his office and advised that her brother had committed suicide the preceding day. (Tr. 371). Plaintiff asked for pain medication to help her stand and walk during the wake and funeral. (Id.) It is indicated that a prescription was given. (Id).

On September 15, 2006, plaintiff saw Dr. Liss, and told him that her brother had died, and that she had been let go from her job at Bed, Bath and Beyond. (Tr. 274). It was noted that plaintiff was seeing a grief counselor at her university, and that she had applied for Social Security. (Id.)

On September 29, 2006, Dr. Ross wrote that plaintiff was

-15-

"able to perform with pain" work-related functions such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling, despite any observed functional limitations. (Tr. 221).

The record indicates that plaintiff underwent physical therapy on numerous occasions from January 20, 2006 through September 1, 2006 at Rehabilitation Professionals, Inc. (Tr. 280-313). Throughout these treatment notes, it is indicated that plaintiff routinely complained of neck pain. See (Id.) On August 15, 2006, plaintiff reported that she was not sleeping well, and that she had started taking steroids, which were not helping. (Tr. 289). Plaintiff consistently reported that her symptoms decreased following physical therapy, but also consistently reported symptoms of worsening pain on subsequent physical therapy visits. (Tr. 287-314). For example, on May 24, 2006, she reported that she was very sore and that a burning sensation had returned, potentially from weaning off Neurontin, (Tr. 300); on June 28, 2006, she reported that she was having a "bad day" and was experiencing an increase in knee pain, (Tr. 295); and on July 31, 2006, she reported that her legs were feeling better, but that her neck was hurting worse. (Tr. 291).

On October 23, 2006, A. Kresheck[27] completed a Psychiatric Review Technique form, pertaining to the period from March 9, 2006

---

[27]Neither A. Kresheck's first name nor credentials are indicated.

to March 9, 2007. (Tr. 322-333). A. Kresheck did not examine plaintiff. It was noted that plaintiff had reported difficulty sleeping, and that she could do light chores "with limitations." (Id.) It is indicated that plaintiff had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, using stairs, remembering, completing tasks, and concentrating. (Id.) It is indicated that plaintiff used a back brace, cane and wheelchair. (Id.) It is indicated that her depression had worsened. (Tr. 332). It is indicated that her statements and reported symptoms appeared to be partially credible, and partially consistent with the medical evidence in her file. (Id.)

It was opined that plaintiff had the medically determinable impairments of Attention Deficit Disorder and depression, and that she had "mild" restrictions in her activities of daily living and in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence, or pace. (Tr. 330). It is indicated that plaintiff had no repeated episodes of decompensation. (Id.)

On that same date, A. Kresheck also completed a Mental Residual Functional Capacity Assessment, pertaining to the same time period. (Tr. 334-336). It was opined that plaintiff had "moderate" limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance; and complete a normal

workday and workweek without interruption from symptoms, and perform at a consistent pace without an unusual number of rest periods. (Tr. 334-35). It was opined that plaintiff was "not significantly limited" in all other respects, and that she had no "marked" limitations. (<u>Id.</u>)

On October 24, 2006, a Physical Residual Functional Capacity Assessment form was completed and signed by "W. Maple." (Tr. 337-42).[28] It is indicated that plaintiff's primary diagnosis was fibromyalgia, and her secondary diagnosis was asthma. (Tr. 337). It was opined that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10; could stand and/or walk for a total of six hours in an eight-hour workday; and could sit, with normal breaks, for about six hours in an eight-hour day. (Tr. 338). It was opined that plaintiff could push and/or pull without limitation. (<u>Id.</u>) No postural, manipulative, visual or environmental limitations were established. (Tr. 339-41). It was noted that plaintiff's asthma was controlled with medication, and that she did not require hospitalization. (Tr. 338). It was noted that she had been diagnosed with fibromyalgia, but ambulated normally and had full range of motion of her spine. (Tr. 339). It was noted that she reported new symptoms of knee pain in July of 2006, and pain increasing in severity. (<u>Id.</u>) W. Maple wrote,

---

[28]The Assessment form does not indicate the preparer's first name, but elsewhere in the record, it is indicated that plaintiff's DDS counselor was named Wendy Maple. <u>See</u> (Tr. 221). The Assessment form does not include the preparer's credentials.

"given the [claimant's] reports of pain and findings in file, she should limit her standing to 6 hours and sitting is unrestricted. She can stand/walk for 6 hours in an 8 hour day." (Id.)

On November 14, 2006, plaintiff saw Dr. Ross with complaints of headaches and tense muscles. (Tr. 349). She had positive tender points upon examination. (Id.) She indicated she needed a letter enabling her to cancel a gym membership. (Id.) On December 19, 2006, Dr. Ross wrote a letter addressed "To Whom It May Concern," stating that he was treating plaintiff for fibromyalgia, and that plaintiff should "refrain from floor exercise and strenuous activity," and should not be enrolled at a gym, as such activities seemed to "worsen her condition." (Tr. 343).

On February 1, 2007, plaintiff saw Dr. Liss and reported that she was taking Spanish, Developmental Psychology, and another class. (Tr. 395). Plaintiff indicated she wished to get a Bachelor of Arts degree in Psychology, and that she had applied for Social Security. (Id.) Plaintiff indicated she wished to try Cymbalta,[29] which Dr. Liss prescribed. (Id.) Dr. Liss's assessment was Attention Deficit Disorder and Fibromyalgia, and he assessed a GAF of 50. (Id).

On April 11, 2007, plaintiff saw Thomas G. Johans, M.D.,

---

[29]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder, and is also used to treat pain resulting from diabetic neuropathy and fibromyalgia.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

of Dr. Schmidt's office, with complaints of pain. (Tr. 372-75). Dr. Johans noted a long history of total body aches and pains. (Tr. 372). Dr. Johans noted that, since seeing Dr. Schmidt in August of 2006, plaintiff quit smoking; quit drinking alcohol and caffeine; modified her diet; and lost 30 to 40 pounds as a result. (Id.) Dr. Johans also noted that plaintiff had changed her major from education to psychology, because she thought that a career in psychology might offer a work environment that allowed for frequent breaks. (Id.)

Plaintiff described her fibromyalgia as total body pain, and that she hurt everywhere someone pressed on her. (Id.) Plaintiff reported that she had pain while resting, sitting, sleeping, and standing, and was never without it. (Tr. 372). Examination revealed antalgic gait, but no rigidity, spasticity or flaccidity of any muscles. (Tr. 373). Trigger points were not elicited. (Id.) Tender points were evident with slight palpation to various areas. (Id.) Extension, flexion and lateral rotation of the back elicited pain, but facet joints were not painful to palpation. (Id.) Neurological examination was negative. (Tr. 373). Plaintiff was alert, fully oriented and well-groomed, and showed normal memory capabilities and reasoning. (Id.) Dr. Johans noted that plaintiff was unable to find a posture that relieved her pain, and that plaintiff constantly wrung her hands and appeared very edgy and jittery. (Id.) Plaintiff reported experiencing trauma because of the loss of her 15-year-old brother to suicide,

and stated that the tragedy caused her to change her life for the better. (Id.)

Dr. Johans assessed fibromyalgia, but also offered the differential diagnoses of myofascial pain syndrome, fibromyalgia, and chronic fatigue syndrome. (Tr. 373-74). Dr. Johans opined that plaintiff may benefit from accupuncture therapy, but explained that such therapy was quite expensive, and required a life-long commitment. (Id.) Dr. Johans opined that trigger point injections for plaintiff's myofascial syndrome and a transcutaneous electrical nerve stimulator (TENS) unit may relieve some of her fibromyalgia symptoms, and may be affordable through Medicaid. (Id). Dr. Johans recommended that plaintiff "stay in close contact" with her psychiatrist because "fibromyalgia certainly has been linked to primary depression and that can be very severe." (Tr. 375).

On March 9, 2007, plaintiff saw Dr. Ross with complaints of a tension headache, stating that she had gone to physical therapy and had pressure behind her left eye. (Tr. 348). Plaintiff reported that, on March 1, 2007, she was involved in an automobile accident in which she was hit from behind, and that it was difficult to walk. (Id.) Upon examination, Dr. Ross noted decreased range of motion of the cervical spine, and muscle spasm. (Id).

On April 23, 2007, plaintiff saw Dr. Liss, and reported that she had lost weight, and had quit smoking and drinking soda, and was no longer taking Cymbalta. (Tr. 394). Plaintiff also

reported that she had earned grades of "A" in all of her subjects. (Id.) Dr. Liss's assessment was Attention Deficit Disorder and fibromyalgia, and he assessed a GAF of 55. (Id.)

On May 28, 2007, Dr. Liss completed a Mental Residual Functional Capacity Questionnaire. (Tr. 397-402). Dr. Liss indicated that plaintiff had depression, attention deficit disorder and fibromyalgia, and that she had an "unpredictable physical mental condition." (Tr. 397). Dr. Liss assessed plaintiff's current GAF at 50, and indicated that her highest GAF in the past year was 51.[30] (Id.) Dr. Liss indicated his clinical findings as poor memory, poor concentration, and fatigue.[31] (Id.)

Dr. Liss opined that plaintiff's symptoms included appetite disturbance and decreased energy, somatization, mood disturbance, difficulty thinking or concentrating, persistent mood and affect disturbance, emotional withdrawal, psychological and behavioral abnormalities, easy distractibility, memory impairment, and sleep disturbance. (Tr. 398). Dr. Liss also offered opinions regarding plaintiff's mental ability and aptitude to perform unskilled, semiskilled, and skilled work, and her mental ability and aptitude to do certain types of jobs. (Tr. 399-400). There were no areas in which Dr. Liss opined that plaintiff was either "unlimited or very good" or "limited but satisfactory." See (Id.)

---

[30]On April 23, 2007, however, Dr. Liss assessed plaintiff's GAF at 55. (Tr. 394).

[31]Other findings are indicated, but are illegible.

Dr. Liss opined that plaintiff had "no useful ability to function" with regard to maintaining attendance and being punctual; sustaining an ordinary routine without supervision; completing a normal workday and workweek without interruptions from psychological symptoms; performing at a consistent pace without an unreasonable number of rest periods; dealing with normal work stress; and understanding, remembering and carrying out detailed instructions. (Id.)

Dr. Liss opined that plaintiff was "unable to meet competitive standards" with regard to remembering work-like procedures; maintaining attention for two hours; responding appropriately to changes in a routine work setting; maintaining awareness of normal hazards and taking appropriate precautions; setting realistic goals and making plans independently; and dealing with stress. (Id.)

Dr. Liss opined that plaintiff was "seriously limited but not precluded" from understanding, remembering, and carrying out short and simple instructions; working without being distracted; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers; interacting with the general public; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and using public transportation. (Id.)

Dr. Liss opined that plaintiff's fibromyalgia interacted with her depression, and that he anticipated that her condition would cause her to be absent from work more than four days per month. (Tr. 401). He indicated that plaintiff was not a malingerer, and that her impairments were reasonably consistent with her symptoms and functional limitations. (Id.)

On June 29, 2007, plaintiff saw Dr. Schmidt with complaints of pain all over, but stated that she had some improvement. (Tr. 376). Dr. Schmidt noted that plaintiff had seen Dr. Johans, and was unable to afford the accupuncture treatment he had recommended. (Id.) Dr. Schmidt noted that plaintiff had changed her diet considerably, and had lost weight. (Id.) Dr. Schmidt noted that Neurontin and Topamax had failed, and recommended that plaintiff take Lyrica[32] and do physical therapy. (Tr. 376-77). Dr. Schmidt's impression was fibromyalgia, and he noted that trigger point injections would not be helpful for plaintiff's diffuse, generalized fibromyalgia pain. (Tr. 377).

Plaintiff saw Dr. Ross on July 19, 2007 with complaints of pain in her neck and shoulders, and reported feeling weak. (Tr. 380). She reported having trouble staying asleep. (Id.) On August 21, 2007, she requested a handicapped parking placard to use

_____

[32]Lyrica, or Pregabalin, is used to relieve neuropathic pain (pain from damaged nerves) that can occur in the arms, hands, fingers, legs, feet, or toes in diabetic patients, or in the area of a rash in patients with shingles. It is also used to treat fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html

at school, but it was indicated that this could not be done secondary to state regulations. (Tr. 381).

On August 6, 2007, plaintiff saw Dr. Liss and indicated she wished to see a particular neurologist who specialized in fibromyalgia. (Tr. 350). Plaintiff indicated that she had taken "8 hours of Spanish" and expected to graduate in 2008 with a bachelor's degree. (<u>Id.</u>) Dr. Liss assessed plaintiff with depression and fibromyalgia, and assessed a GAF of "<50." (<u>Id</u>).

On January 17, 2008, plaintiff saw Dr. Ross and reported that she was doing her daily exercises, but that they hurt, and that she felt bad that she hurt every day. (Tr. 384). Dr. Ross's assessment was "FMS," which is an abbreviation for Fibromyalgia Syndrome. (<u>Id.</u>)

In June of 2008, Dr. Liss wrote that plaintiff had applied for social security, and was engaged and planning a June 2009 wedding. (Tr. 387).

On July 30, 2008, Dr. Liss completed a second Mental Residual Functional Capacity Questionnaire. (Tr. 388-93). Dr. Liss indicated that he had treated plaintiff since 1997, and had seen her every one to three months. (Tr. 388). Dr. Liss indicated his diagnoses as Attention Deficit, Fibromyalgia, and "disability," and assessed plaintiff with a current Global Assessment of Functioning ("GAF") score of "<50," and also indicated that this

was plaintiff's highest GAF in the past year.[33]  (Id.)  Dr. Liss
indicated that plaintiff was taking Effexor and Adderall, and that
these medications caused no side effects.  (Id.)  Dr. Liss
indicated his clinical findings as "mood swings, fatigue,
exhaustion, poor attention, poor concentration," and wrote that
plaintiff's prognosis was "persistent, progressive." (Id.)  Dr.
Liss indicated that plaintiff exhibited several symptoms, including
anhedonia (loss of interest in almost all activities) and emotional
withdrawal; disturbances in appetite, mood and memory; decreased
energy; anxiety, psychological/behavioral abnormalities; and
persistent "disturbance of vision, speech, hearing, use of a limb,
movement and its control, or sensation."  (Tr. 389).

　　　　With regard to plaintiff's aptitude to do unskilled work,
Dr. Liss opined that plaintiff had "no useful ability to function"
with regard to maintaining regular attendance and being punctual;
sustaining an ordinary routine without special supervision;
completing a normal workday or workweek without interruptions from
psychologically-based symptoms; performing at a consistent pace
without an unreasonable number and length of rest periods; and
dealing with normal work stress.  (Tr. 390).  Dr. Liss opined that
plaintiff was "unable to meet competitive standards" with regard to

---

[33]GAF scores of 50 or below indicate serious symptoms or serious
impairment in social, occupational, or school functioning. Halverson v.
Astrue,  600 F.3d 922, 931 (8th Cir. 2010) (citing DSM-IV at 32).

remembering work-like procedures; maintaining attention for two-hour segments; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers; responding appropriately to changes in a routine work setting; and maintaining awareness of normal hazards and taking proper precautions. (<u>Id.</u>) Dr. Liss opined that plaintiff was "seriously limited, but not precluded," with regard to understanding, remembering, and carrying out very short and simple instructions, and asking simple questions or requesting assistance. (<u>Id.</u>) There were no areas in which Dr. Liss found plaintiff "unlimited or very good," or "limited but satisfactory." <u>See</u> (Tr. 390). Dr. Liss then wrote: "combination of poor memory poor concentration, moods, exhaustion, muscle weakness and pain makes it difficult to be employable." (<u>Id.</u>)

With regard to plaintiff's mental ability to do semiskilled and unskilled work, Dr. Liss opined that plaintiff had "no useful ability to function" with regard to understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with stress of semiskilled and skilled work. (Tr. 391). With regard to plaintiff's mental ability to do particular types of jobs, Dr. Liss opined that plaintiff was "unable to meet competitive standards" with regard to traveling in unfamiliar

places and using public transportation, and was "seriously limited, but not precluded" with regard to interacting with the general public; maintaining socially appropriate behavior; and adhering to basic standards of neatness and cleanliness. (Id.)

Dr. Liss opined that plaintiff did not have a low I.Q. or reduced intellectual functioning. (Tr. 392). Dr. Liss opined that plaintiff's depression and fibromyalgia exacerbated her experience of pain and physical symptoms, and that her impairment had lasted, or could be expected to last, for at least twelve months. (Id.) He opined that plaintiff's condition would cause her to be absent from work for more than four days per month. (Id.) Dr. Liss opined that plaintiff was not a malingerer, and that her impairments were reasonably consistent with her symptoms and functional limitations. (Id.)

B.   Hearing Testimony

During the administrative hearing held on August 22, 2008, plaintiff was represented by attorney Traci Severs, and responded to questioning by the ALJ and Ms. Severs.

When questioned by the ALJ, plaintiff testified that she was twenty-seven years of age, and was a senior at a local university. (Tr. 22). Plaintiff testified that she was twelve credit hours away from a bachelor's degree in psychology with a minor in Spanish, and only two courses away from a separate bachelor's degree in Spanish. (Id.) Plaintiff also testified

that, upon graduation, she would be only two classes away from obtaining a bachelor's degree in Spanish, and planned to return to school to complete that degree, in the hopes "to translate or something someday." (Tr. 22-23). Plaintiff testified that she lived in a townhouse with her boyfriend, who was present at the hearing. (Tr. 23).

Plaintiff testified that she last worked on August 12, 2006. (<u>Id.</u>) Before this date, plaintiff spent some time off work on "FMLA"[34] and had returned to work with accommodations, including working four hours per day, but found she was unable to do the job's "basic requirements." (<u>Id.</u>) The last time plaintiff worked full-time was March of 2006, when she worked for "Bed, Bath, and Beyond" as a customer service employee, performing such duties as checkout and returns, and bridal consulting. (Tr. 24). Plaintiff testified that this job required a lot of heavy lifting, sometimes 20 to 30 pounds, and sometimes heavier items, such as boxes containing sets of dishes. (<u>Id.</u>)

Plaintiff testified that "a host of things" precluded her from working full-time. (Tr. 25). She testified that it hurt her to stand or sit for too long; that she was sensitive to fluorescent lights, which caused "severe headaches"; that she was unable to focus on things; and that she had to stop and rest if she felt sore or tired. (<u>Id.</u>) Plaintiff testified that she had to have time to

---

[34]"FMLA" is an abbreviation for Family Medical Leave Act.

do her physical therapy exercises each day, and that she had to make sure that she "[got] in some meditation or other things to make sure that [she could] release stress and tension that way." (Id.) Plaintiff testified, "It's - - it seems as if my days are always so full with just being able to, be able to get through that day, and be able to do it all over again the next day." (Id.) Plaintiff testified that she had tried to work at a company that her parents owned, but would work for an hour and stop due to great pain. (Tr. 25).

Plaintiff described her pain as "very generalized," and that it covered her entire body. (Id.) She testified that her pain often concentrated in her trapezius area and neck, and that she experienced headaches. (Id.) She testified that, if she walked for too long, she had pain in her knees, and then stated, "[o]r, some days, it's just there because it just wants to be there in my knees, or - - and goes there." Plaintiff testified that she had cramping in her hands after writing, "even just writing for school," and would then be unable to grasp things. (Tr. 26). Plaintiff testified, "[m]y skin, if you touch my skin, it feels like it's bruised all over, so even like (INAUDIBLE) bumping up to me or something can be quite painful." (Id.) Plaintiff testified, "I have a difficult time sleeping, so I have to make sure that - - my whole day is spent taking care of myself. I'm unable to get my house clean. I'm unable to - - there's so many things that - - you know, there's so many accommodations that, that I need that I still

haven't found.  At this time, working 40 hours a week, being able to work full-time and bring home a full-time status paycheck is impossible." (Id.)

Plaintiff testified that she was taking nine credit hours at school, and that she received services from the Disability Office at her university.  (Id.)  She testified that she had "a great deal of accommodations, including excused absences and accommodations that the nature of employment would not, would not allow." (Tr. 26).  Plaintiff testified that she missed a lot of class, and that her papers were accepted late on many occasions. (Id.)  She testified that she took her tests outside of the classroom away from everyone else because of her concentration and focus issues.  (Tr. 26-27).

Plaintiff testified that she suffered from fibromyalgia, which began in the fall or winter of 2005-2006 and was diagnosed by Dr. Ross, following a period of time during which plaintiff took many different pain medications and tried a number of things, including limiting her activity and seeing a chiropractor, to control her pain.  (Tr. 27-28).  She testified that she once lost all functioning in her extremities following a chiropractic adjustment, and visited the emergency room.  (Tr. 27).  Plaintiff testified that she was once referred to a Pain Management Center, which she considered to be "diagnosis by experimenting." (Tr. 27-28).

Plaintiff testified that she could walk for about 10 or

15 minutes; could stand for 20 minutes; and could sit for an hour. (Tr. 28). She testified she could lift no more than five pounds due to problems with her neck, and due to a "tuning fork" sensation in her arms. (Tr. 29). Plaintiff explained, "It's a combination of things. My hands are, are, are weak. They experience pain. My arms - - it's the whole - - the entirety of every muscle that, that is involved in lifting is affected." (<u>Id.</u>)

Plaintiff testified that she was once 20 pounds overweight, and that she used to smoke a pack of cigarettes per day, and drink soda and beer. (<u>Id.</u>) She testified that she stopped these behaviors after being advised that they were detrimental to her health. (<u>Id.</u>) Plaintiff also testified that she began walking for exercise, and lost nearly 50 pounds. (<u>Id.</u>) She testified that she stopped going to physical therapy for financial reasons, and that her parents and grandmother had been paying for it, but it became too much. (Tr. 29-30). Plaintiff testified that she continued on her own the lessons she learned in therapy. (Tr. 30).

Plaintiff testified that she had been seeing a psychiatrist "for many years," and that she continued to do so following the loss of her brother in 2006. (Tr. 30-31). She testified that she had "mild depression" stemming from the loss of her brother and also due to her inability to work, stating that she had once been a hard worker. (Tr. 31). Plaintiff testified that her depression affected every aspect of her life. (<u>Id.</u>) She

explained,

> I do struggle when, you know, when I struggle
> from depression, and it, it affects everything
> in my life. It affects my relationships with
> those around me, I'm irritable, it's hard,
> hard for me to get out of bed, it's hard for
> me to sleep, it's hard for me to do a lot.
> But I think I could overcome - - I think I
> would have been able to - - I don't know. I
> guess, if I - - I don't know. Everything just
> seems to be [exacerbated]. Every - - my highs
> aren't as high as they used to be, and my lows
> are much lower than they used to be. And I
> was diagnosed with attention deficit when I
> was 15, and that is something that I've always
> tried to overcome, but it is apparent in every
> aspect of my life. It is apparent in my
> finances, it's apparent when I clean the
> house. You know, I have - - I'll start
> cleaning one room, and I, I notice something
> in another, and I, and I stop, and I go to the
> other room, and it's the same thing. And so,
> when you look around, everything's been
> started, but nothing has been finished. And
> that pretty much has been the pattern in my
> life always. But I would try to do things to,
> to overcome them, but that's why I have the
> accommodations at [her university]. They
> originated because of my mental health issues
> and because of my inability to concentrate and
> to focus, because I would go to take a test,
> and I would notice, instead of being able to
> retrieve the information that I had stored
> from studying, all I could zero in on was the
> person flipping a page next to me; and the
> person walking in the hall; or some
> (INAUDIBLE); or people would start turning in
> their, their tests, and I would become very
> anxious; or - - and - - but my distractibility
> has increased tenfold because of the severe
> amount of pain that I'm in, and it has
> definitely impaired my abilities to do a great
> many things that I used to find very
> enjoyable.

(Tr. 31-32).

Plaintiff testified that she took Effexor, Adderall (while in school), Lyrica, Bactrim,[35] and Amitriptyline (Elavil) for sleep. (Tr. 32-33). When asked about side effects, she testified that Amitriptyline caused her to crave sweets, and to have a dry mouth. (Tr. 33).

When asked about her daily activities, plaintiff testified that, when not in school, she rose and ate breakfast; took her dog for a five-minute walk; and did some low-impact exercises, the exercises prescribed during physical therapy, which took two hours to complete. (Tr. 34). Plaintiff testified that she also meditated, and then made lunch. (Id.) She testified that she went to the grocery store and picked up little things rather than getting everything at once. (Id.) Plaintiff testified that she tried to clean a room, but that this did not always happen. (Id.) Plaintiff testified that she once spent an hour cleaning a bathroom, and as a result was "useless" during the entire following week. (Tr. 34). Regarding laundry, plaintiff testified that her boyfriend carried the laundry baskets up and down the stairs, but that she changed the loads and folded the laundry. (Id.) Plaintiff testified that she liked to cook, and that she drove. (Tr. 34-35). Regarding attending to her personal care, plaintiff

---

[35]Bactrim, or Co-Trimoxazole, is an antibiotic that is a combination of trimethoprim and sulfamethoxazole, a sulfa drug. It eliminates bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines. It is also prescribed for other purposes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684026.html

testified that she was able to perform "the minimum care," but also testified that she used a shower chair to accomplish shaving her legs. (Tr. 35). She testified that she could not blow dry her hair because it was hard to hold the blow dryer. (Id.) Plaintiff further testified that, at times in the past, she had required assistance from a family member to climb the stairs to get to the shower, and to bring meals to her, but that such intervention was not presently necessary. (Id.)

Plaintiff testified that she had trouble being around people who were smoking, and did not like to be in loud areas. (Tr. 36). She testified that she had no trouble being around people while at the grocery store. (Id.) Plaintiff testified that her wedding was scheduled for "next June." (Id.)

Plaintiff testified that she had once complained to a doctor about being sore after going boating in 2006, but that she had not been boating since that time. (Id.) She testified that she had a large, close-knit family that often vacationed at "the lake," but that she was no longer able to be a part of that. (Tr. 36). Plaintiff testified that "working out," medication, resting when she needed to rest, and eating healthy helped her. (Tr. 36-37). When plaintiff was asked whether her medications helped, she replied "[n]ot really," and then stated that Lyrica did not help; Amitryptyline "definitely helps;" Adderall helped her to focus when she needed to; and Effexor has helped her emotions "follow an equilibrium, find some kind of equilibrium." (Tr. 37). Plaintiff

testified that nothing helped with her pain.  (Tr. 37-38).

Plaintiff testified that her "worst" problem was the pain, because it exacerbated everything else, and dictated her life.  (Tr. 38).

Upon examination by her attorney, plaintiff testified that her boyfriend worked "all day and all night now since I, since I moved in, and since we were going to be getting married.  He, he works six times more than the average person to make up for my lack of working."  (Id.)  Plaintiff testified that her boyfriend also had to take responsibility for many other things because she was unable to take care of the house or shop for groceries.  (Tr. 39). Plaintiff testified that she had been attending college for ten years.  (Id.)  She testified that she was easily overwhelmed, and had changed her career goal away from being a teacher because  of the work hours and fluorescent lights, and because she would not be able to just take a nap or take a walk.  (Tr. 40).  Plaintiff testified that she had considered being a psychologist, because she could stretch in between patient appointments, but concluded that graduate school was too competitive.  (Tr. 40-41).  Plaintiff concluded that school had been a "long journey," because she was "still fishing for, for the answer."  (Tr. 41).

Plaintiff testified that she missed working, missed being a part of something, and testified that she would do anything to be able to work again.  (Id.)  Plaintiff's attorney noted that plaintiff was "very well-dressed," and plaintiff replied that she

liked to try to look nice every day because she felt that if she looked nice on the outside, she might feel better on the inside. (Id.)

The ALJ then heard testimony from Delores Gonzalez, a Vocational Expert ("VE"). Ms. Gonzalez questioned plaintiff regarding her prior employment, and plaintiff testified that she had worked as a cashier for two years, as a server at parties, and as a waitress at Bar Italia for two to three years, and as a child care worker for three and a half years. (Tr. 43-44).

Ms. Gonzalez classified plaintiff's past work as a cashier as light and unskilled, but noted that plaintiff had described it as involving lifting up to 30 pounds. (Tr. 44). Ms. Gonzalez classified plaintiff's child care and food service jobs as light and semiskilled jobs. (Id.)

The ALJ asked Ms. Gonzalez to assume a hypothetical person of plaintiff's age, education, and past work, and to further assume that the individual was "limited to performing what is defined as light exertion level work, with the limitations that the individual could frequently climb stairs and ramps, ropes, ladders, and scaffolds; and frequently balance, stoop, kneel, crouch and crawl; that the individual was limited to reaching in all directions to frequent as - - and not constant; the individual should avoid concentrated exposure to unprotected heights and hazardous machinery; the individual should - - or, must work in a temperature-controlled environment; and the individual is limited

to performing simple tasks only, as far as that goes." (Tr. 45). The ALJ asked Ms. Gonzalez whether such an individual could perform any of plaintiff's past work, and Ms. Gonzalez testified that such an individual could work as a cashier, and as a server at parties. (Tr. 45-46). The ALJ then asked Ms. Gonzalez to assume an individual with all of the previously-mentioned non-exertional limitations, but who was limited to only sedentary-level work. (Tr. 46). Ms. Gonzalez testified that such a person could work as a surveillance system monitor; a charge account clerk; and as an addressor. (Id.) The ALJ then asked Ms. Gonzalez to assume an individual with all of the exertional and non-exertional limitations of the person in the second hypothetical, with the added requirement that such job would have to allow for occasional unscheduled disruptions of both the workday and the workweek, and Ms. Gonzalez testified that there would be no jobs available in the open labor market for such a person. (Tr. 46-47).

Plaintiff's counsel then asked Ms. Gonzalez whether jobs would exist for a person with a GAF of 50. (Tr. 47). Ms. Gonzalez testified that such a person would have serious symptoms globally, socially, occupationally, and in school functioning, and that there would be no jobs available for a person who consistently had GAF scores of 50 or below. (Id.)

## III.   The ALJ's Decision

The ALJ in this case noted that plaintiff had met the insured status requirements through March 31, 2010. (Tr. 7). The ALJ determined that plaintiff had the "severe" impairments of depression, degenerative disc disease of the cervical spine, and fibromyalgia. (Tr. 9). The ALJ determined that, due to plaintiff's depression, she had the following limitations: "mild restrictions of activities of daily living; no difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration." (Id.) The ALJ also found that, while plaintiff had a history of asthma, that condition did not impose any significant work-related limitations, and was not severe. (Id.) The ALJ found that plaintiff did not have an impairment, or combination of impairments, of listing-level severity. (Id.) The ALJ determined that plaintiff retained the residual functional capacity to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit for six hours in an eight-hour workday; stand/walk for six hours in an eight-hour workday; frequently climb ramps and stairs; frequently climb ropes, ladders, and scaffolds; frequently balance, stoop, kneel, crouch, crawl, and reach in all directions. (Tr. 10). The ALJ found that plaintiff should avoid concentrated exposure to hazardous machinery and unprotected heights, and must work in a temperature-controlled environment, and was limited to performing simple tasks only. (Id.)

The ALJ concluded that plaintiff was capable of performing her past relevant work as a cashier and server at parties, and was not under a disability as such is defined in the Act. (Tr. 15-16).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the

Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion. <u>Johnson v.</u>

-41-

Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole ... requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

> 1. The ALJ's credibility findings.
>
> 2. The plaintiff's vocational factors.
>
> 3. The medical evidence from treating and consulting physicians.
>
> 4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
>
> 5. Any corroboration by third parties of the plaintiff's impairments.
>
> 6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050

(8th Cir. 1999).

If, however, after review, the court finds it possible to draw two inconsistent conclusions from the evidence, and one of those conclusions represents the Commissioner's decision, the Commissioner's decision must be affirmed. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); see also Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted) ("[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision").

Plaintiff claims that the ALJ erroneously failed to give controlling weight to the opinion evidence of Dr. Liss, plaintiff's treating psychiatrist, arguing that the ALJ "simply rejected" Dr. Liss's opinion, and instead gave substantial weight to the opinion of A. Kresheck, a non-treating, non-examining medical consultant. Noting that the form completed by A. Kresheck includes neither the consultant's first name nor his or her credentials, plaintiff questions whether A. Kresheck is an acceptable medical source. Plaintiff also contends that the ALJ failed to fully and fairly develop the record, arguing that the ALJ found Dr. Liss's opinions conclusory, but sought no clarification. Plaintiff concludes that, due to these errors, the ALJ's RFC is not supported by substantial evidence on the record as a whole.

Plaintiff also contends that the ALJ's decision is inconsistent, inasmuch as he found plaintiff's asthma to be non-

severe, but nonetheless determined that she must work in a temperature-controlled environment. Finally, plaintiff argues that the ALJ failed to describe the physical and mental demands of her past relevant work, and failed to relate her RFC to those demands.

In response, the Commissioner contends that the ALJ properly discredited plaintiff's subjective complaints, and also properly discredited the opinions of Dr. Liss, inasmuch as Dr. Liss failed to note the medically acceptable clinical or laboratory diagnostic techniques supporting his conclusions, and failed to share what observations of plaintiff supported his opinions. The Commissioner further suggests that Dr. Liss's opinions were inconsistent with other medical information in the record, including the observations of Drs. Tracy, Johans, and Schmidt.[36] The Commissioner also contends that the ALJ was under no duty to re-contact Dr. Liss, inasmuch as Dr. Liss's opinions are detailed and related to the Act's disability standard. The Commissioner also contends that the ALJ properly determined that plaintiff could perform her past relevant work, inasmuch as he outlined plaintiff's physical and mental limitations, and solicited VE testimony on the subject.

For the following reasons, the Commissioner's decision

---

[36]The Commissioner also notes that the Psychiatric Review Technique form and the Mental Residual Functional Capacity Assessment were completed by "Aine Kresheck, M.D., a psychologist," and that these opinions supported the ALJ's determination of plaintiff's RFC. (Docket No. 22 at 19). The Commissioner does not, however, indicate what information from the administrative transcript supports the conclusion that A. Kresheck has a medical degree and/or is a psychologist.

should be reversed, and this cause should be remanded to the Commissioner for further proceedings.


    A.   <u>Credibility Determination</u>

       Although plaintiff herein does not directly challenge the ALJ's analysis of plaintiff's credibility, she does challenge the RFC determination, and the undersigned will therefore examine the ALJ's credibility determination. <u>See</u> <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

       The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984). In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain;

(3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The foregoing Polaski factors are to be considered in addition to the objective medical evidence of record. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When an ALJ considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez, 403 F.3d at 957.

In discrediting plaintiff's allegations of pain and other symptoms precluding all work, the ALJ cited 20 C.F.R. §§ 404.1529 and 416.929, the Regulations corresponding with the Polaski decision and credibility determination, and discussed plaintiff's hearing testimony and the medical evidence in the record. (Tr.

10).  The ALJ then wrote that the objective medical findings failed to provide "strong support" for plaintiff's allegations of disabling symptoms and limitations, and that plaintiff's subjective complaints were "so severe as to appear implausible."  (Tr. 14). Review of the medical evidence of record, however, fails to support the ALJ's credibility determination.

The ALJ in this case appeared to place great significance on the lack of objective medical evidence to support plaintiff's allegations of pain and other symptoms precluding all work.  While the ALJ was correct in noting that plaintiff's objective testing revealed minimal findings, and while the undersigned recognizes that an ALJ may permissibly consider the fact that there is no medical evidence to support a plaintiff's subjective complaints, the lack of objective evidence alone is insufficient to support an adverse credibility determination.  <u>Polaski</u>, 739 F.2d 1322 (ALJ may not rely solely upon the lack of objective medical evidence in discrediting a claimant's subjective complaints).  Under the facts of the case at bar, substantial evidence does not support the weight the ALJ placed upon the lack of objective medical evidence. Plaintiff was repeatedly diagnosed with fibromyalgia, and no doctor ever suggested that plaintiff was malingering or magnifying her symptoms.  "Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.'"  <u>Tilley v. Astrue</u>, 580 F.3d 675, 681 (8th Cir. 2009) (quoting <u>Sarchet v.</u>

Chater, 78 F.3d 305, 306 (7th Cir. 1996)).

Review of the record reveals that plaintiff's hearing testimony regarding her symptoms and limitations is consistent with the complaints and symptoms she reported to Drs. Ross, Johans, and Schmidt on the multiple occasions she saw them for medical treatment, none of whom ever suggested that plaintiff may be malingering or exaggerating her symptoms. Plaintiff's testimony is also consistent with the pain and other symptoms which have been recognized in cases involving claimants who have been diagnosed with fibromyalgia. Tilley, 580 F.3d at 681 (noting that fibromyalgia's characteristics include chronic and widespread aching and stiffness, involving particularly the neck, shoulders, back and hips, which is aggravated by the use of those muscles); Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003) (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)) ("fibromyalgia can be disabling because of its potential for sleep derangement and resulting daytime fatigue and pain"); see also Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994) (recognizing that pain itself may be disabling). It therefore cannot be said that substantial evidence supports the ALJ's reliance upon the lack of objective medical evidence, or his observation that plaintiff's complaints were so severe as to be incredible, in discrediting plaintiff's allegations of disabling symptoms.

The ALJ also discredited plaintiff's allegations of

disabling symptoms because she had received only routine and/or conservative care; her condition had not required surgery; and there was no evidence of emergency room treatment, hospitalizations, or injections for pain relief. (Tr. 14). While an ALJ is generally entitled to consider the conservative nature of a claimant's medical treatment in assessing a claimant's credibility, under the facts of the case at bar, it cannot be said that substantial evidence supports the ALJ's decision to do so here. The record in this case reflects numerous doctor's visits, and also reflects that plaintiff was repeatedly diagnosed with fibromyalgia. No physician ever recommended surgery, and Dr. Schmidt specifically opined that injections were not indicated for fibromyalgia. Furthermore, there is no medical evidence suggesting that plaintiff has not been pursuing a valid course of treatment. Bowman v. Barnhart, 310 F.3d 1080, 1084 (8th Cir. 2002) (The ALJ erred in considering that plaintiff had been treated medically, not surgically, when no medical evidence indicated that surgery would help the claimant's condition, and when no medical evidence suggested that the claimant had not been pursuing a valid course of treatment). In addition, the Eighth Circuit has recognized that the American College of Rheumatology does not recommend surgery for fibromyalgia. Brosnahan, 336 F.3d at 677 (ALJ erred in discrediting plaintiff by considering, in part, that she had only conservative treatment and that surgery was not indicated, inasmuch as "the ACR does not recommend surgery for fibromyalgia.")

The ALJ also determined that plaintiff's testimony concerning the limited nature of her daily activities could not be objectively verified within any reasonable degree of certainty. The ALJ noted that, even if plaintiff's activities were as limited as she alleged, such limitations were difficult to attribute to her medical condition, given the "relatively weak medical evidence" and other factors. (Tr. 14). If by "weak" the ALJ was referring to the lack of significant findings from objective testing, as explained above, substantial evidence does not support such a conclusion. See Tilley, 580 F.3d at 681 (recognizing that the symptoms of fibromyalgia are entirely subjective).

The undersigned also notes that the ALJ, in the context of discrediting plaintiff's testimony that her daily activities were very limited, noted that plaintiff attended school, and was within a few credit hours of earning a degree in psychology. (Tr. 14). The ALJ wrote that plaintiff did well in school, and obviously had the physical ability to attend class, and the mental capacity to focus on her coursework. (Id.) The ALJ failed, however, to address those portions of the record indicating that plaintiff was enrolled in college on a part-time basis; that she received significant accommodations from her university's disability office; that she had spent many years pursuing a degree that most people complete in four years. While plaintiff did testify that she planned to graduate and to pursue a second degree in Spanish, and while Dr. Liss noted that plaintiff had earned

-50-

grades of "A" in all of her classes, plaintiff was not enrolled on a full-time basis, and also testified that she received services from her university's Disability Office. (Tr. 26). In her unrefuted testimony, which is not challenged by the Commissioner, plaintiff described receiving from the Disability Office "a great deal of accommodations, including excused absences and accommodations that the nature of employment would not, would not allow." (Id.) Plaintiff explained that she missed a lot of class; that her papers were accepted late on many occasions; and that she was allowed to take her examinations outside of the classroom away from everyone else because of her concentration and focus issues. (Tr. 26-27). While the ALJ was correct in noting plaintiff's college attendance and good academic performance, he failed to take into account the significant accommodations that plaintiff testified allowed such performance, and, likewise, failed to address whether she would be able to function on a full-time basis outside such a structured setting. The fact that plaintiff was able to function well in a structured setting on a part-time basis does not permit the conclusion that she is able to engage in substantial gainful activity. See Thompson v. Schweiker, 665 F.2d 936, 939-40 (9th Cir. 1982) (claimant's past performance in sheltered work activity did not establish that he had the RFC to perform substantial gainful activity. "An individual who can do limited work is not automatically denied benefits, unless the Secretary shows he is capable of increased use of his work skills

or abilities.")

The ALJ also wrote that he was considering plaintiff's work history to be a "neutral" factor because, while plaintiff worked regularly, she earned little. The ALJ did not, however, make any effort to determine why plaintiff's earnings were low, and the undersigned notes that plaintiff's work history indicates that she worked in jobs that typically pay little. Without further analysis, it cannot be said that the ALJ adequately developed or properly considered plaintiff's work history. <u>See</u> <u>Salts v. Sullivan</u>, 958 F.2d 840, 845 (8th Cir. 1995) (citations omitted) (absent analysis regarding why claimant's earnings were so low, ALJ's observation that plaintiff earned little did not constitute substantial evidence to support his adverse credibility determination).

While it was permissible for the ALJ to consider plaintiff's demeanor during the hearing, <u>Smith v. Shalala</u>, 987 F.2d 1371, 1375 (8th Cir. 1993) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"), because of the errors discussed above, it cannot be said that substantial evidence on the record as a whole supports the ALJ's adverse credibility determination. On remand, the Commissioner should consider plaintiff's subjective complaints in a manner consistent with

<u>Polaski</u>, and with this opinion.[37]

B.    <u>The Opinion Evidence of Dr. Liss</u>

Next, plaintiff argues that the ALJ erroneously failed to give controlling weight to the opinions Dr. Liss expressed in his two Mental Residual Functional Capacity Assessments, and also argues that the ALJ should have re-contacted Dr. Liss. In response, the Commissioner contends that the ALJ properly gave less-than-controlling weight to Dr. Liss's opinions. For the following reasons, plaintiff's arguments are well-taken.

It is the province of the ALJ to resolve any conflicts among the various treating and consulting physicians, and the ALJ may reject the opinion of a treating physician if it is inconsistent with the record as a whole. <u>Pearsall</u>, 274 F.3d at 1219. Factors relevant to the ALJ's consideration of the weight to give a treating physician's opinion include the length, nature, and extent of the treatment relationship; whether the opinions are consistent with other evidence in the record; and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d); <u>see also</u> <u>Tilley</u>, 580 F.3d at 679 (citations omitted) (A treating

_____

[37]On remand, the Commissioner should ensure that the record contains some medical evidence supporting the determination of plaintiff's RFC. In this case, the ALJ's RFC determination tracks the RFC assessment of W. Maple, a DDS counselor. While the ALJ properly noted that W. Maple was not an acceptable medical source and that her opinion was not entitled to substantial weight, his RFC determination is very similar to her assessment. This observation is especially significant in light of the fact that the ALJ wrote that he considered the medical evidence of record to be weak, and in light of the fact that his credibility determination is flawed.

physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the balance of the medical information in the record).

In discounting Dr. Liss's opinions, the ALJ wrote:

> Although the opinions of a treating physician may be entitled to substantial weight, such an opinion is not conclusive and must be supported by medically acceptable clinical or diagnostic data. Dr [sic] Liss, while supportive of the claimant's disability, apparently relied heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept as true most, if not all, of what the claimant reported. Nevertheless, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The opinions expressed by Dr. Liss are quite conclusory, and they are not supported by his treatment notes or the longitudinal evidence. He has provided very little explanation of the evidence relied upon in forming his opinions. The record does not contain any opinions from treating or examining physicians, other than Dr. Liss, indicating that the claimant is disabled or has limitations greater than those determined in this decision.

(Tr. 13).

As far as the record discloses, it does not appear that the ALJ properly considered the substantial duration and extent of plaintiff's treatment relationship with Dr. Liss. Dr. Liss indicated that he had seen plaintiff three to four times per year since 1996, and his treatment notes indicate that he consistently prescribed numerous medications for her. In addition, it cannot be

said that the opinions Dr. Liss expressed in his RFC Questionnaires are inconsistent with his treatment notes, inasmuch as those Questionnaires indicate serious limitations, and his treatment notes document frequent visits, relatively serious diagnoses, and consistently-prescribed medications. Nor can it be said that Dr. Liss's opinions, or his treatment notes, are inconsistent with the balance of the medical evidence of record. Plaintiff consistently sought medical treatment from numerous medical treatment providers, and was repeatedly diagnosed with fibromyalgia and prescribed medications. Dr. Johans noted that fibromyalgia was linked with depression that could be very severe, (Tr. 375), an observation consistent with Dr. Liss's observation that plaintiff's fibromyalgia and her depression were linked. (Tr. 401). In addition, plaintiff was observed by other treatment providers to be anxious. Dr. Johans noted that plaintiff constantly wrung her hands and appeared anxious and jittery, and also that she appeared to be unable to find a posture that relieved her discomfort. (Tr. 373.) Dr. Tracy noted that plaintiff was mildly anxious. (Tr. 182). Also notable is the fact that Dr. Liss was plaintiff's only treating psychiatrist. It cannot be said that Dr. Liss's opinions were so inconsistent with the other medical information in the record as to be incredible.

Furthermore, as quoted above, in discounting Dr. Liss's opinions, the ALJ also wrote that Dr. Liss appeared to have "relied heavily" upon plaintiff's subjective complaints, and appeared to

have wholly accepted them despite the fact that, "as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints." (Tr. 13). As discussed above, however, substantial evidence does not support the ALJ's credibility determination, and it therefore cannot be said that Dr. Liss's apparent reliance upon plaintiff's subjective complaints was a good reason to discount Dr. Liss's opinions. Finally, the ALJ wrote that no other doctor indicated that plaintiff was disabled or had limitations greater than those the ALJ determined existed. The undersigned notes, however, with the exception of Dr. Schmidt (whose June 9, 2006 note indicated that plaintiff asked to speak to him regarding a leave of absence, and Dr. Schmidt responded that he did not do disability ratings, (Tr. 364)), it does not appear that any other treating physician was asked to provide such an opinion, and the absence of such other opinions is therefore of no consequence. See Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006).

Plaintiff also argues that the ALJ erred in failing to re-contact Dr. Liss. The undersigned agrees. Social security hearings are non-adversarial, and it is the ALJ's responsibility to "develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). The Regulations provide that an ALJ should, in some circumstances, re-contact a treating physician to seek clarification regarding his or her opinions. 20 C.F.R. §§

404.1512(e); 416.912(e).

Indeed, Dr. Liss's Residual Functional Capacity Questionnaires failed to indicate the basis supporting his opinions, and his treatment notes are cursory at best, as the ALJ and the Commissioner noted. However, under the circumstances presented here, the ALJ should have re-contacted Dr. Liss and sought additional evidence and/or clarification regarding the basis or bases upon which his opinions rested. While the undersigned recognizes that an ALJ is not required to re-contact a treating physician when he or she is able to determine from the record whether a claimant is disabled, the case at bar does not present such a situation. As noted above, Dr. Liss had treated plaintiff on a regular basis for over ten years, and had routinely prescribed medication. It defies logic to assume that Dr. Liss would have treated plaintiff for this length of time, and would have routinely prescribed significant medication for her, without first determining the medical criteria warranting such treatment. Furthermore, it cannot be said that Dr. Liss's opinions were necessarily inconsistent with his treatment notes. If the ALJ believed that Dr. Liss failed to explain his reasoning, under the circumstances of the case at bar, he should have re-contacted Dr. Liss to seek such explanation. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003) (ALJ erred by failing to recontact neurologist who had treated the claimant for over five years and had prescribed powerful medication and referred the claimant to

specialists, noting that if the ALJ believed that the doctor's notes were of no value, given the extensive treatment history in the case, the ALJ should have contacted the doctor for additional evidence or clarification).

The ALJ's errors concerning Dr. Liss are magnified by the fact that, instead of developing the record by seeking further evidence and/or clarification from Dr. Liss, the ALJ in this case instead relied on the report of non-examining agency consultant A. Kresheck, who offered the only opinions in this matter inconsistent with those of the treating psychiatrist. Indeed, in his opinion, the ALJ wrote that A. Kresheck's opinions were "entitled to substantial weight." (Tr. 14). The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Also problematic with the ALJ's reliance upon A. Kresheck's opinion is the lack of any information in the administrative transcript regarding A. Kresheck's identity or credentials. The ALJ identifies A. Kresheck as "Aine Kresheck, a psychologist," and refers to A. Kresheck using masculine pronouns. (Tr. 13). In his brief, the Commissioner identifies A. Kresheck as "Aine Kresheck, M.D., a psychologist," and uses feminine pronouns. (Docket No. 22 at 19). In the Psychiatric Review Technique form and in the Mental Residual Functional Capacity Assessment form, A. Kresheck failed to indicate his or her first name or credentials,

and neither the ALJ nor the Commissioner cite any evidence from the administrative transcript supporting the conclusion that A. Kresheck has a medical degree and is a psychiatrist, or has a Ph.D. and is a psychologist, or has some other credentials qualifying him or her as an acceptable medical source. In deciding whether to uphold or remand the ALJ's decision, this Court must look to the pleadings and the transcript of the record. See 42 U.S.C. § 405(g) ("The Court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing" the Commissioner's decision). Because A. Kresheck's name and medical credentials are not apparent from the record, the undersigned cannot say with sufficient certainty that A. Kresheck is an acceptable medical source.

The undersigned therefore finds that the ALJ gave insufficient reasons for discounting Dr. Liss's opinions, and failed to fulfil his duty to ensure a fully and fairly developed record by failing to re-contact Dr. Liss to seek additional evidence and/or clarification regarding what evidence supported his opinions. Furthermore, the opinions of A. Kresheck do not amount to substantial evidence on the record as a whole to support the ALJ's RFC determination, both because A. Kresheck never examined plaintiff, and because the record does not support the conclusion that A. Kresheck is an acceptable medical source. Remand is therefore required to allow the Commissioner to address these issues.

C.    <u>Alleged Inconsistencies in the Hearing Decision</u>

Plaintiff next contends that the ALJ's decision was inconsistent because the ALJ determined that plaintiff's asthma was non-severe, but nonetheless determined that plaintiff must work in a temperature-controlled environment.    Plaintiff asserts that asthma is the only one of her impairments that would require such an environment, and if the ALJ believed plaintiff should work in a temperature-controlled environment, he "also must believe asthma is a severe impairment."  (Docket No. 17 at 14).

Plaintiff offers no argument or citation to the record supporting the conclusion that her asthma was indeed severe, and review of the record reveals none.  Instead, plaintiff argues only that the ALJ must have believed that her asthma was severe if he opined that plaintiff should work in a temperature-controlled environment.  As plaintiff raises it, this claim amounts to mere speculation.  On this issue as plaintiff raises it, her claim is denied.


D.    <u>Physical and Mental Demands of Past Relevant Work</u>

Finally, plaintiff argues that substantial evidence does not support the ALJ's determination that she could return to her past relevant work, because the ALJ did not relate her RFC to the physical and mental demands of her past relevant work.  However, because the undersigned has determined that the ALJ's credibility

and RFC determinations are not supported by substantial evidence on the record as a whole, it is unnecessary to determine whether the ALJ properly related the RFC he determined to the physical and mental demands of plaintiff's past relevant work. Upon remand, it will be for the ALJ in the first instance to do so, after properly assessing plaintiff's credibility and RFC.

Therefore, for all of the foregoing reasons, upon the claims that plaintiff raises,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed, and this cause is remanded for further consideration consistent with this opinion.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of July, 2010.